IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA )
)
v ) CR. NO. 1:06cr107-MHT
) (WO)
MICHAEL DAVID HARVEY )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. Introduction**

The defendant, Michael David Harvey ("Harvey"), is charged in with one count of abusive sexual contact involving young children in violation of 18 U.S.C. § 2244(a)(1) and two counts of sex with a person less than twelve years old in violation of 18 U.S.C. § 2241(c). On June 15, 2006, Harvey filed a motion to suppress, in which he asserts that his statement to law enforcement officers was involuntary and that a waiver of his rights was not knowingly and intelligently made. The court held an evidentiary hearing on the motion on November 26, 2006. Based on the evidence presented to the court and argument of the parties, the court concludes that the motion to suppress is due to be denied.

**II. Facts**

**A. The March 6, 2006 Statement**

Ryan D. Bostain ("Agent Bostain") is a United States Army Criminal Investigation Division special agent. While stationed at Camp Shelby in Mississippi, Agent Bostain was ordered to interview Harvey, a nineteen-year-old man, regarding a possible sexual assault on a minor that occurred in Fort Rucker, Alabama. Military officials cautioned Agent Bostain that Harvey "was slow mentally" and that he had "the mind capacity of a . . . fourteen to

fifteen year old." (R. 8.) On March 6, 2006, Agent Bostain and Jimmy Newman ("Investigator Newman"), an investigator for the Covington County Sheriff's Department, went to the Powers' residence. Upon arriving at the house, Agent Bostain saw Johnny Power, Harvey's step-father, in the garage and Harvey working on the engine block of a semi-truck. (R. 9.) Agent Bostain informed Mr. Power that he was a special agent and that he wished to speak with Harvey at the Covington County Sheriff's Department. (R. 10.) The agent also requested that Mr. Power be present during the interview. (*Id.*) After Mr. Power indicated that he and Harvey would meet them after "they were done cleaning up," Agent Bostain and Investigator Newman left the area.

About a half hour later, Mr. Power and Harvey arrived at the Covington County Sheriff's Department and followed Agent Bostain to Investigator Newman's office.[1] During their initial conversation, Investigator Newman sat behind his desk, Mr. Power and Harvey sat in front of the desk, and Agent Bostain sat at one end of the desk. The door to the interview room was closed and Agent Bostain and Investigator Newman were unarmed and wearing plain-clothes.[2]

Prior to interviewing Harvey, Agent Bostain showed both Harvey and Mr. Power a parental consent form and advised them that, given Harvey's diminished mental capacity, he felt it was necessary to offer Mr. Power the opportunity to consent to an interview. Both Harvey and Mr. Power signed the form, which stated, "I, Johnny Power, being the legal

---

[1] Investigator Newman's office is approximately 12' x 14'.

[2] Agent Bostain wore a suit and Investigator Newman wore pants and a polo shirt. (R. 13.)

guardian/parent of Michael D. Harvey, do hereby permit said person to submit to an interview, fingerprints, videotape, photograph, pertaining to indecent assault on a child under the age of 16." (Gov's Ex. 1.) Agent Bostain also showed Mr. Power and Harvey a "Rights Warning Procedure/Waiver Certificate" and advised Harvey of his rights, including his right not to answer any questions or say anything, his right to request a lawyer, and his right to stop answering questions at any time. (Gov's Ex. 2.) When Agent Bostain asked Harvey whether he understood his rights, Harvey stated, "Yes." (R. 26.) Harvey placed his initials next to each identified right and handwrote "I am willing to waive my rights and make a statement." (R. 27; Gov's Ex. 2.) After both Harvey and Mr. Power signed the waiver certificate, Agent Bostain began the interview.[3]

Within a short time after Harvey and Agent Bostain began discussing the case, Agent Bostain noticed that Harvey seemed to be embarrassed about their discussion. (R. 35.) Agent Bostain then asked Harvey "Would you feel more comfortable if Mr. Power left the room?" (*Id*.) When Harvey indicated that he wanted his step-father to leave, Agent Bostain and Mr. Power left the room and Mr. Power waited in the lobby.[4]

After Agent Bostain returned to the room and continued the interview, Harvey admitted to "touching John Doe on his penis but over his jeans." (R. 36.) When Agent

[3] Agent Bostain testified that the interview began at 2:50 p.m. and ended at 7:00 p.m. (R. 32.)

[4] Agent Bostain's and Mr. Power's testimony concerning the length of time Mr. Power was present during the interview is conflicting. Agent Bostain testified that Mr. Power left Investigator Newman's office approximately an hour and a half after the interview began. (R. 35.) However, Mr. Power testified that he left the room within five minutes after Agent Bostain began the interview. (R. 111.) It is not necessary for the court to resolve this dispute which is irrelevant to the issues before the court.

Bostain began typing Harvey's statement, he asked Harvey to tell his story. (R. 37.) As Harvey relayed his version of the events, he began telling the story in the first person present tense. (*Id.*) Agent Bostain then picked up a book and told Harvey, "[T]his is an interview book. This is how to interview people. There are a lot of these books out, and each one of them tells us the same thing. If somebody is telling you something that should have happened in the past but they're telling new the present tense, they're making it up as they go and they're lying about it." (*Id.*) Agent Bostain then stated, "So there is something else you're not telling me, and I'd like to discuss that with you."[5] (*Id.*) At this point, Harvey gave a detailed statement to Agent Bostain. (R. 38.) During their discussion, Agent Bostain had to explain what the terms "ejaculate" and "sexual gratification" meant. (R. 34.) After Agent Bostain finished typing, Harvey read the statement and initialed each page. (R. 46.) At the end of the interview, Agent Bostain asked Harvey whether he was offered the opportunity to take breaks, use the restroom, and eat or drink and he responded, "Yes." (R. 47; Gov's Ex. 3.) In addition, Harvey indicated that his treatment during the interview was "good." (*Id.*) At the conclusion of their discussion, Harvey signed the statement.[6] (R. 51.)

---

[5] Agent Bostain testified that his tone was conversational and that he did not become hostile or aggressive at any time. (R. 37-38.)

[6] Specifically, Harvey signed an attached affidavit, which stated that "I, Michael D. Harvey, have read or have had read to me this statement which begins on page 1 and ends on page 6. I fully understand the contents of the entire statement made by me. The statement is true. I have initialed all corrections and have initialed the bottom of each page containing the statement. I have made this statement freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." (Gov's Ex. 3.)

**B. The Mental Limitations**

Since kindergarten, Harvey has suffered from learning difficulties. (R. 99.) His parents testified that Harvey is able to follow instructions when supervised, but that he needs to be instructed to do one task at a time. (R. 90, 96, 105, 108-09.) For example, Harvey is able to put shocks on a truck if an adult instructs and supervises him while he completes each task. (R. 105.) Throughout his schooling, Harvey attended special education classes. (R. 100.) During Harvey's childhood, his parents had to instruct him on how to bathe himself; however, his attention to personal hygiene is better. (R. 95.)

Dr. Rodolfo Buigas, a Federal Bureau of Prisons forensic psychologist, examined Harvey and reviewed his prior intellectual testing results. Dr. Buigas testified that one test by another examiner indicated that Harvey had a full-scale intelligence quotient ("I.Q.") in the sixties range, which corresponds to mild mental retardation. (R. 80.) Another psychiatrist on a previous occasion determined that Harvey's intelligence was in the "low average to average range." (*Id.*) Dr. Buigas' testing of Harvey indicated an I.Q. score of 77, which is in the range of borderline intellectual functioning. (*Id.*) Dr. Buigas assessed that, in light of Harvey's I.Q. results, his performance in school, and his attendance in special education classes, Harvey's intelligence is within the "low average to . . . borderline intellectual functioning range." (R. 82.)

**III. Discussion**

Harvey asserts that the waiver of his rights and confession were involuntary because he suffers from mental limitations. Specifically, he contends that law enforcement officials

took advantage of his low intelligence by manipulating him into asking his step-father to leave the room and by conducting the interview in an intimidating location.

In *Miranda v. Arizona*, the Court held that a person questioned by law enforcement officials after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." 384 U.S. 436, 444 (1966). The requirement to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492 (1977). In determining whether a person was in custody, the court "must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint of movement" of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994), *quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323.

Under the circumstances of this case, Harvey's freedom of action was not curtailed to a degree associated with a formal arrest during the interview at the Sheriff's Department. After Agent Bostain initially approached Harvey's step-father outside his home and informed him of the allegations against Harvey, he did not transport Harvey to the Sheriff's Department; instead, he told Mr. Power that they could meet him at the Covington County

Sheriff's Department later that afternoon to discuss the matter. In addition, the interview was conducted in an office with an unlocked door, Agent Bostain and Detective Newman were unarmed and in civilian's clothing, and Mr. Power remained in the office until Harvey requested that he leave the room. Furthermore, because Agent Bostain was not on federal property, he was not authorized to arrest Harvey. Thus, a reasonable person in Harvey's position would have understood that he was not in custody. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *U.S. v. Long*, 866 F.2d 402 (11th Cir. 1989). Consequently, there was no requirement that Harvey be advised of his *Miranda* rights. Nonetheless, Agent Bostain read him his *Miranda* rights prior to the interview, and the court, therefore, will analyze the voluntariness issue as if *Miranda* did apply.

In fact, the court finds that Agent Bostain took numerous precautions to ensure that Harvey's waiver of *Miranda* rights and his statement were voluntarily, knowingly, and intelligently made. Under *Miranda*, the admission of statements taken during a custodial interrogation conducted outside the presence of a suspect's attorney is conditioned on the Government's ability to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475. The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S.

157, 167 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that a defendant's *Miranda* rights have been waived. *Moran*, *supra*.

In this case, the evidence shows that law enforcement officials did not coerce Harvey into giving a statement. Although Harvey argues that Agent Bostain took advantage of his intellectual limitations, the low intelligence of a defendant does not in itself render a confession involuntary. *See Colorado v. Connelly*, *supra*; *Hubbard v. Haley*, 317 F.3d 1245, 1254 (11th Cir. 2003) (citing *Singleton v. Thigpen*, 847 F.2d 668, 670-71 (11th Cir. 1988). Absent allegations of coercive police tactics to obtain a statement, a confession will not be deemed involuntary. *Connelly*, 479 U.S. at 167; *Singleton*, 847 F.2d at 671; *U.S. v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987). Agent Bostain did not subject Harvey to an interrogation of "exhaustingly long duration."[7] *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988). In addition, Harvey does not allege that law enforcement officials applied physical force or threatened to do so. Nor is there any suggestion that Agent Bostain made any promises of reward to induce Harvey's statement. Moreover, Harvey's step-father was present when Harvey was read his rights and entered a waiver. Mr. Power was present at the Sheriff's Department and available to Harvey during the entire length of the interview. Furthermore, the evidentiary materials indicate that Harvey provided his statement "freely

[7] The interview lasted four hours and ten minutes. (R. 32.)

without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." (Gov's Exhs. 1-3.) Thus, there is no evidence of "official overreaching" by Agent Bostain to warrant a conclusion that Harvey's confession was involuntary under constitutional law. *Miller*, *supra.*

This court's determination that Harvey's statement was voluntary, however, does not end the analysis. The ultimate issue in this case is whether Harvey's statement was knowingly and intelligently made. The court notes that, although Mr. Power testified that he had doubts that Harvey understood his rights, that testimony is wholly at odds with his actions during the interview. First, when Agent Bostain explained the content of the rights warning certificate and waiver certificate to Harvey, Mr. Power did not stop the interview or inform Agent Bostain of his belief that Harvey may not understand the explanation. Secondly, Mr. Power testified that he left the interview when Harvey requested that he do so. (R. 113.) Thus, Mr. Power treated Harvey as if he were able to voluntarily and intelligently waive his constitutional rights during the interview.[8] Recent psychiatric evaluations and test

[8]Power's responses to the court's questions during the evidentiary hearing is are instructive:

THE COURT: Mr. Power, you've testified you had concerns about David's ability to understand. If that's so, why did you leave when he asked you to do so?
THE WITNESS: I left for his sake. He asked them – that they asked him did he want me in the room while they questioned him, and he said no, that he would feel better if I went outside.
THE COURT: So you acquiesced to his desire?
THE WITNESS: To his desire, yes sir.

(R. 121)

These responses belie a conclusion that Harvey lacks understanding. Power's concern for Harvey's sensitivities about the subject matter of the interview reflects a belief that Harvey indeed has the capacity for understanding.

scores also indicate that Harvey's intelligence is in the range of low average to borderline intellectual functioning. (R. 82.) This court therefore finds that Harvey's waiver of his constitutional rights was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See Toste v. Lopes*, 861 F.2d 782 (2nd Cir. 1988)(holding that defendant who was "streetwise, communicated relatively well, and operated at about a sixth to seventh grade level," knowingly and intelligently waived his right to remain silent).

Upon consideration of the totality of the circumstances surrounding the interrogation, this court concludes that Harvey's choice was uncoerced and that he had the requisite level of comprehension to waive his rights and provide a statement to law enforcement officials. *See Moran*, *supra*.

## IV. Conclusion

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be denied. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **December 20, 2006.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual

findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 7th day of December, 2006.

/s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE