1  read them together but it is clear that his score is

2  lower on the verbal than the performance?

3  A    Yes.

4  Q    You take that score of sixty-four and you couple it

5  with other information that you have the ability to

6  perform certain functions and routines to determine

7  whether or not this person is really limited?

8  A    Correct.

9  Q    Nothing further.

          MR. SPEIRS:  No questions.

          THE COURT:  Thank you, Doctor.

          (Whereupon the witness, Rudy Buigas, stepped

down from the stand.)

          MR. SPEIRS:  That's all the witnesses I have,

Your Honor.

          MR. BUTLER:  Your Honor, at this time I'm

going to call Mr. Steven D. Harvey, Senior.

          S T E V E N    D.    H A R V E Y,    Sr.,

the witness herein, having first been duly sworn or

affirmed to tell the truth, was examined and testified

as follows.

                    DIRECT EXAMINATION

          BY MR. BUTLER OF STEVEN D. HARVEY, SENIOR:

Q    Could you state your name and spell your last name

for the record?

1  A    Steven D. Harvey.  H-a-r-v-e-y.

2  Q    Mr. Harvey, do you know Michael Harvey?

3  A    I do.

4  Q    And how do you know Mr. Harvey?

5  A    He's my son.

6  Q    Where do you reside?

7  A    I live in Madison, Mississippi.

8  Q    And prior to his arrest in this case, did Mr.

9  Harvey live with you?

10  A    Prior to the arrest, about four months prior to up

11  until then he lived with me.

12  Q    He was arrested in March of oh six, so you're

13  saying on or about the beginning of this year he was

14  living with you, January of oh six?

15  A    Right, around that time.

16  Q    How long -- I have to ask.  How long have you known

17  your son?

18  A    Since his birth.

19  Q    Okay.  Has your son, based on what you could see,

20  developed like other children?

21  A    No, he has not.

22  Q    Could you describe when you first had an

23  understanding that -- well, a belief that something --

24  that your son wasn't learning at the same level of other

25  children?

1   A    From the time he was even an infant, normal age

2   that a child would start talking and forming words and

3   sentences, he didn't do that.  He was almost two or

4   more, or a little older before he could speak properly.

5   Q    Okay.  Did his troubles or difficulties learning

6   continue?

7   A    They did.

8   Q    Let's just move this forward.  Between about the

9   ages of two and six, did you notice or observe any

0   difficulties?

1   A    There were some problems.  He would throw temper

2   tantrums for basically no reason.  I guess as a loving

3   parent didn't want to admit that there was something

4   wrong with my son.  I wanted him to grow up and be

5   healthy, but he had problems.

6   Q    Between the ages of two and six, was he in any type

7   of structured learning the environments, nursery school

8   or kindergarten?

9   A    Nothing really structured, no.

0   Q    When did he begin to attend structured learning?

1   A    At the age of five I believe he started

2   kindergarten.

3   Q    Okay.  And did he perform as the other children?

4   A    No, he did not.  He did some of his basic things

5   like learning to tell time, he had extreme difficulties

```
 1   with that.

 2   Q     But he did eventually learn it?

 3   A     He did eventually pick it up, yes.  I think thanks

 4   to the age of digital clocks, it really helped him out a

 5   lot.

 6   Q     Early elementary, grades one through five, was he

 7   in class with other the students?

 8   A     He was for probably through the second grade I

 9   think, but the teachers began to notice -- As a matter

10   of fact, his second grade year he was held back.

11   Q     So he was held back when his class moved to the

12   third grade he stayed in second?

13   A     Right.  It was advised to us at that time that he

14   be placed in special education, or to be tested first.

15   And we had him tested, and since that time it's pretty

16   much been special education class.

17   Q     He remained in special education classes for the

18   remainder of his schooling?

19   A     Yes, sir, pretty much all his life.  There were

20   some classes that the teachers would attempt to move him

21   back into mainstream or regular classrooms, but he

22   didn't do well under those conditions.

23   Q     As recently as, and this continued through his

24   entire life?

25   A     Yes, his entire life.
```

Q    I'm just going to move things up.  Your son was

arrested in March of this year.  At the time -- And you

indicated that you -- he was living with you in early oh

six, possibly around January, three months before this?

A    Right.

Q    Or December of oh five.  Did Michael ever have

difficulties following instructions and/or doing what he

was told?

A    Yes, he did.  Michael was -- I'm sorry for

hesitating.  I don't know how to say this.  He was -- If

I gave Michael instructions, I would have to give him

instructions very specific to what I wanted him to do.

And that was one of the things that was talked to his

mother and I both in counseling.  We had to enter

counseling, too, to help us learn how to help him.  And

we were told to break our instructions down into very

simple terms and limit what we told him to do to one

thing at a time.

Q    Let me back up.  If you told him multiple things,

like if you gave him multiple requests, lets's say

three, clean your room, do your homework, take a bath,

how would he respond?

A    Oh, he would get probably a portion of his room

cleaned up, and after that he couldn't handle that much

information, or process that at one time.

Q      So three instructions were a lot for him to
understand?

A      Absolutely.  It was too much for him.

Q      You lived and known your son for his entire life.

A      That's correct, yes.

Q      And an instruction or an advisement that he has the
right to remain silent, anything he says can and will be
used against him, you have the right to an attorney, if
you cannot afford an attorney one will be afforded to
you, based on your twenty years of experience with
Michael, let's say that that was explained to him at a
normal pace, not rapidly but at a normal pace, when that
is given to him how much wo he remember or comprehend?

A      I don't think he would comprehend anything very
much further than you have the right to remain silent.

       THE COURT:  Well if you told him you've got
the right to remain silent, wo he understand that?

       THE WITNESS:  I don't think he would
understand what that meant, no, sir.  I don't believe he
would understand it at all.

Q      You told me of an incident where you instructed him
to do something, I believe it was regarding the dishes.

A      Right.

Q      Could you explain what that incident was?

A      After dinner, if I told Michael to clean the table,

for example, it's your turn to clean up the table after

dinner, he wouldn't -- he would get his plate, but --

and might get his glass, but after that he wouldn't --

he would just either lose interest or wouldn't know what

to do next, basically.

Q    My follow-up to that is, when you told him after

dinner to clean the table, did he acknowledge yes, I

understood you?

A    Oh yes, he would start.  Anything I instructed him

to do he would start.

Q    So if you said, for instance, you know, sign this

form before you clean the table, he would sign the form?

A    Yeah, he would have signed the form probably, but I

don't think he would have gotten very far to cleaning

the table up after that, no.

Q    So it was never clear whether or not even after you

told him and he said he understood it, whether or not he

really understood anything.

A    I knew just from years of being with him and

watching him grow up what his limits were, and if I

needed him to do something then I would be there with

him step by step through the process to do whatever it

was that was asked of him.  If I wanted him to clean his

room, for example, I would explain to him he needed to

pick up all his toys.  Then I would explain to him to

pick up his clothes. And it was a broken down process.

Q    If you explained to him all of those things even individually all at one time and he acknowledged them to you, clean your room means pick up your toys, make your bed, put your clothes in the closet and fold your clothes, it entailed those four things, he would, I don't want to lead you, would he understand those four things even if they're explained to him slowly?

A    No.

THE COURT: But he can do some things?

THE WITNESS: He can do it somewhat if he's instructed.

THE COURT: How?

THE WITNESS: He has pretty decent motor skills as far as hands on. He's quite a good artist, as a matter of fact. He can draw pretty well. He can draw things that he sees. I always admired his ability because I don't have that ability. But I'm proud of him for that. He's quite an artist.

I can take him through the process of tearing down a head-on a V eight engine, and he'll go through the process, but I have to be there with him. It's not something that he could -- he couldn't go through the process by himself. By no means.

Q    Mr. Harvey's mother, her name?

A    Charlee Power.

Q    And you two are no longer together?

A    No.  We've been divorced since nineteen ninety-three.

Q    Does Michael stay with her regularly?

A    He went with her at least one weekend a month and two weeks out of the summer.  And most of the major holidays, either Thanksgiving or Christmas we'd alternated that through the years, but I had custody.

Q    Could you describe for the Court if he was going to see his mother what you would tell him to do as far as packing?

A    That was one of the problems that we would have. His mother would call me after he got -- or she picked him up or I carried him.  She would call me and say, "He doesn't have any clothes," or "He didn't bring anything but socks."  If I told him to pack a bag to go stay at his mother's, I would have to specifically tell him to pack two pair of pants or two shirts.  If I just told him to pack his bag for his mother's or for the weekend, he may fill the bag with nothing but socks or nothing but shirts.  And that's happened as recently as just a couple of years ago.

Q    Did Michael ever have any difficulty with bathing and/or cleansing himself?

A    He did.

Q    Could you explain that?

A    I tried to pass that off as him just being a
typical boy and hating to take a bath, but even if he
did go to take a bath he wouldn't clean himself
properly. He had to be told exactly what to do. And
after a time he learned he needed to clean himself.

Q    And how old was he before this started to set in?

A    Oh, I don't think he bathes properly now,
personally.

Q    But he's better?

A    He's better.

Q    In a structured environment where people tell you
to get up at a given time, go to point X, go to bed,
turn off the lights, Michael might do okay in that
environment?

A    I know for a fact he was placed for one year in
alternative school in Madison County, Mississippi for
bad behavior at school. And during that -- It's an
extremely structured school. As a matter of fact, the
principal of the school was a former military army
special forces, eighteen or twenty years with the
military. And he ran that school similar to a military
fashion. I had a great amount of respect for him, as a
matter of fact.

But his reports and the teachers' reports were that there was an adult with him from the time he got on the bus to the time they brought him home all day, and he did very well under those conditions where he was specifically told everything that he had to do. And he responded in kind.

Q    A person -- Withdraw it.

So in a structured environment, it appears that he can -- he's performing normally in an ultra structured environment.

A    If he's properly supervised, and it takes a great amount of supervision, he does very well in just about anything he's given.

Q    Thank you. Nothing further.

                    CROSS EXAMINATION

        BY MR. SPEIRS OF STEVEN HARVEY, SENIOR:

Q    Mr. Power --

A    I'm Mr. Harvey.

Q    I'm sorry. Mr. Harvey. I'm Verne Speirs with the U. S. Attorney's Office.

You were not in the Covington County Sheriff's Office on March sixth of oh six, were you?

A    No, I was not.

Q    So you know -- You will agree with me that you have no idea whether anyone ever became hostile with your

1    son, is that right?

2    A    I have no idea.

3    Q    You have no idea whether anyone became overbearing

4    or what even the environment was like when your son was

5    giving his interview, do you?

6    A    No, I have no knowledge of that at all.

7    Q    Nothing whatsoever.  All right, sir.

8         Now you testified that your son has the

9    ability to break down a V eight engine?

10   A    No, I did not.

11   Q    If you can explain -- What was it about the engine

12   that your son could do?

13   A    If I worked with him and helped him, he can do

14   that.  I can tell him what to do and can he do it.

15   Q    So if you tell him to go get a ratchet, he can

16   identify a ratchet?

17   A    Sometimes.

18   Q    Or if you tell him to go get a hammer, he can go

19   get a hammer?

20   A    Right.

21   Q    Or if you tell him to go get a screwdriver he can

22   get a screwdriver?

23   A    Right.

24   Q    Or if you tell him to get a quart of oil, he can go

25   get quart of oil?

A    Right.

Q    Or if you tell him to get any particular tool to
accomplish this, if you generally tell him what it is,
he can go get it.

A    Well, if I tell him to get a nine millimeter metric
box and wrench, he's probably not going to do that.

Q    Neither could I.  But if you told him to go and get
basic items, he could go and get those items and help
you accomplish the task?

A    He certainly can.

Q    Thank you, sir.  That's all the questions I have.

        THE COURT:  Thank you, Mr. Harvey.

        (Whereupon the witness, Steven Harvey, Senior,
stepped down from the stand.):

        THE COURT:  Your next witness, Mr. Butler?

        MR. BUTLER:  At this time I'm going to call
Charlee Power.

                C H A R L E E    P O W E R,

the witness herein, having first been duly sworn or
affirmed to tell the truth, was examined and testified
as follows:

                DIRECT EXAMINATION

        BY MR. BUTLER OF CHARLEE POWER:

Q    Miss Power, make sure you sit nice and close to the
microphone so that we can pick you up.